IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES, for the use of, WHITETAIL GENERAL CONSTRUCTORS, LLC, a Montana limited liability company, | CV 24-64-BLG-SPW-KLD |
| Plaintiff, | FINDINGS & RECOMMENDATION |
| vs. | and |
| NORTHCON, INC., an Idaho corporation, and NATIONWIDE MUTUAL INSURANCE COMPANY, an Ohio corporation, | ORDER |
| Defendants. | |

This contract case comes before the Court on Defendants Northcon, Inc. and Nationwide Mutual Insurance Company's motion for summary judgment on all claims (Doc. 35) and Plaintiff United States for the use of Whitetail General Constructors, LLC's ("Whitetail") cross-motion for partial summary judgment (Doc. 42). For the reasons set forth below, Defendants' motion for summary judgment should be granted as to Whitetail's statutory failure to timely pay claim (Count 4) but denied in all other respects, and Whitetail's motion for partial summary judgment should be denied.

I.      **Background**

The dispute between the parties arises out of a construction project to build an 18-plex apartment building in Crow Agency, Montana ("the Project"). (Doc. 47 at ¶ 8). On September 12, 2023, Defendant Northcon, Inc. ("Northcon") entered a prime contract with United States Department of Health and Human Services, Indian Health Service ("IHS") to act as the prime contractor for construction of the Project. (Doc. 47 at ¶ 9). IHS is the owner/government agency of the Project. (Doc. 47 at ¶ 10).

On September 29, 2023, Defendant Nationwide Mutual Insurance Company ("Nationwide") issued a payment bond for the Project on behalf of Northcon. (Doc. 44 at 2 ¶ 2, 9). The payment bond lists Northcon as the principal and Nationwide as the surety, states that Nationwide agrees to "bind[] itself, jointly and severally with the Principal, for the payment of" the bond amount, and provides that the obligation to pay the bond amount "is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract" between IHS and Northcon. (Doc. 44 at 9).

Around the same time, in mid-September 2023, Northcon executed two subcontracts with Whitetail, one for Whitetail to perform electrical work on the Project and the other for Whitetail to perform plumbing work on the Project. (Doc.

47 at ¶¶ 13-14). The subcontracts were lump sum contracts pursuant to which Whitetail agreed to perform specific plumbing and electrical work for specific lump sum amounts. (Doc. 47 at ¶ 15). Under such a lump sum contract, progress payments are typically made based on the value associated with the percentage of work completed. (Doc. 47 at ¶ 30). Consistent with this general practice, Whitetail would submit payment applications to Northcon, and Northcon would in turn submit payment applications to IHS. (Doc. 47 at ¶ 47). After receiving payments from IHS, Northcon would generally disburse payments to Whitetail. (Doc. 47 at ¶ 47). The subcontracts made payment from IHS to Northcon "an absolute condition precedent" to Northcon's obligations to make progress or final payment to Whitetail. (Doc. 47 at ¶ 48; Doc. 36-1 at 3; Doc. 36-2 at 3).

As set forth in the subcontracts, the scope of Whitetail's work on the Project was subject to modification by way of written change orders. (Doc. 58 at ¶ 4; Doc. 36-1 at 4; Doc. 36-2 at 4). According to Whitetail, Northcon significantly changed the scope of its work under the subcontracts by, for example, increasing the number of void forms used to encase underground lines and forcing additional void forms into Whitetail's scope of work. (Doc. 58 at ¶ 4). Northcon disagrees that the change orders regarding void forms significantly changed the scope of Whitetail's work (Doc. 58 at ¶ 4), and claims that a number of problems arose after Whitetail began performance of the subcontracts, including issues with Whitetail's pay

applications, failure to order materials before receiving payment, and payroll submissions. (Doc. 47 at ¶¶ 33, 35-37, 39-40). For example, Northcon asserts that (1) Whitetail's pay applications did not focus on the percentage of work completed and were instead driven by the amount of Whitetail's labor burden (Doc. 47 at ¶ 33); (2) in contravention of the standard practice for federal construction projects, Whitetail would not generally order materials until first receiving payment, thereby precluding Northcon from reviewing invoices from vendors to substantiate payment (Doc. 47 at ¶¶ 35-37); and (3) Whitetail had challenges correctly submitting certified payroll during the Project, which is a requirement on government projects (Doc. 47 at ¶¶ 39-40).

It is undisputed that the subcontracts did not require Whitetail to obtain a performance or payment bond prior to commencing work on the Project, and Whitetail's bids for the Project did not include a price for a bond. (Doc. 58 at ¶ 5; Doc. 44 at 3 ¶ 6). After Whitetail had begun its work on the Project, however, Northcon sought a bond or other assurance from Whitetail for its obligations under the subcontracts. (Doc. 47 at ¶ 42). According to Northcon, it did so based on its concerns about Whitetail's performance, as well as concerns about Whitetail's creditworthiness based on a prior bankruptcy filing. (Doc. 47 at ¶¶ 25-27, 42, 44). By email dated November 30, 2023, Northcon advised Whitetail that it would pay Whitetail's payment applications "half now with the other half released pending

receipt of [Whitetail's] bond." (Doc. 58 at ¶ 6; Doc. 44 at 12). Whitetail responded by letter on December 5, 2023, offering to obtain an irrevocable letter of credit (ILOC) assuring its work for the Project, on the condition that Northcon would agree to release the balance due on Whitetail's initial payment applications and to not hinder payment on Whitetail's second payment applications. (Doc. 58 at ¶ 7; Doc. 44 at 17). With that understanding, Whitetail initiated the process of obtaining an ILOC.  (Doc. 44 at 17). As Whitetail informed Northcon in an email two weeks later, however, Whitetail's bank declined its request for an ILOC. (Doc. 36-6 at 2). It is undisputed that Whitetail did not furnish an ILOC for the Project. (Doc. 47 at ¶ 46).

During December 2023, Northcon made payments to Whitetail for work performed in October and November of 2023. (Doc. 58 at ¶ 9; Doc. 47 at ¶ 54; Doc. 36-9 at 3). Northcon did not make any additional payments to Whiteail after December 2023. (Doc. 58 at ¶ 9). On February 21, 2024, Whitetail requested an update on its most recent payment application. (Doc. 44 at 21). Northcon responded on February 22, 2024, advising Whitetail that IHS would be "releasing funding to us tomorrow" and Northcon would "start cutting checks" by Monday, February 26, 2024. (Doc. 58 at ¶ 8; Doc. 44 at 19). Northcon did not pay Whitetail on or after February 26, 2024. (Doc. 58 at ¶ 8).

On February 28, 2024, Northcon's Senior Project Manager, Marc Donnot, emailed Whitetail's Project Manager, Tommy Baxter, and explained that "part of the hold up" with payment involved change orders. (Doc. 58 at ¶ 10; Doc. 44 at 24). Donnot wrote: "I need these [change orders] signed to get things processed. My bad, apologies, it totally slipped by me they were sitting in the file since Christmas." (Doc. 44 at 24). Later that day, Baxter emailed Donnot to confirm—as they had apparently discussed on the phone—that "Whitetail is halting production on plumbing and electrical work at Crow 18 until funding has been released." (Doc. 47 at ¶ 58; Doc. 36-10 at 2).

On March 1, 2024, Whitetail emailed Northcon a "Statutory Notice of Work Stoppage for Non-Payment." (Doc. 47 at ¶ 60; Doc. 36-13 at 2-4). The Notice of Work Stoppage asserted that an outstanding balance in the amount of $855,609.99 was "due from Northcon to Whitetail for work, materials, equipment, and labor" on the Project, and stated that "Whitetail has not been paid for ANY item or scope of work performed for the last 90 Days." (Doc. 36-13 at 4). The notice additionally stated that Whitetail had "every intention of returning to work immediately once funding has been brought current" but "if all payment obligations owed to Whitetail are not satisfied within 30 days from the date of suspension," Northcon should consider the subcontracts statutorily terminated pursuant to Montana law. (Doc. 36-13 at 4). Northcon responded by email the same day and asked Whitetail

6

to "remove all their equipment and trailers from the jobsite starting on Monday the 4th until you are complete." (Doc. 44 at 28).

At around this time, IHS rejected Northcon's February 2024 payment application because IHS apparently determined that it had overpaid Northcon for electrical and plumbing work based on the amounts billed compared to the progress made. (Doc. 36 at ¶ 18; Doc. 36-12). Just a few hours after receiving Whitetail's March 1, 2024, Notice of Work Stoppage, Northcon advised Whitetail that IHS had denied the February 2024 payment application "due to lack of performed work on the contract" and "not providing necessary invoices for materials requested for payment." (Doc. 47 at ¶ 59; Doc. 36-11 at 2). According to Northcon it resubmitted the February 2024 payment application to reflect a $320,000 credit to IHS for electrical and plumbing work, but by the time it did so Whitetail had stopped work on the Project. (Doc. 36 at ¶ 18; Doc. 56-1). Northcon sent Whitetail a Notice of Default on March 8, 2024. (Doc. 47 at ¶ 70; Doc. 36-14). It is undisputed that Whitetail did not complete its electrical or plumbing scope of work under the subcontracts.  (Doc. 47 at ¶¶ 71-72).

On June 3, 2024, Whitetail filed this action against Northcon asserting six claims for relief. (Doc 1). Count 1 alleges a claim against Northcon and Nationwide on the payment bond in the amount of $895,551.98 pursuant to the Miller Act, 40 U.S.C. § 3131-3134. Counts 2 through 6 are alleged against

Northcon only, as follows: Count 2 for breach of the subcontracts; Count 3 for breach of the implied covenant of good faith and fair dealing; Count 4 for failure to timely pay; Count 5 for negligent misrepresentation; and Count 6 for tortious interference. (Doc. 1 at 3-7). Northcon has asserted counterclaims against Whitetail for breach of the subcontracts and breach of the implied covenant of good faith and fair dealing. (Doc. 13).

Defendants move for summary judgment on all six claims alleged in the Complaint and also ask the Court to rule as a matter of law that Whitetail is not entitled to consequential damages, including lost profits. (Doc. 35). Northcon additionally moves for partial summary judgment on liability as to its contract counterclaims. (Doc. 35). Whitetail cross-moves for partial summary judgment on liability on its Miller Act payment bond claim, leaving the issue of damages for trial. (Doc. 42).

Before considering these motions on the merits, the Court addresses two procedural challenges raised by Defendants. First, Defendants move to strike Whitetail's summary judgment response brief, statement of disputed facts, and the declaration of Whitetail's owner, Jasper Jones, as untimely. (Doc. 48). Under the Local Rules for the District of Montana, responses to motions "for summary judgment must be filed within 21 days after the motion was entered on the docket." L.R. 7.1(d)(1)(B)(i). Defendants filed their motion for summary judgment on June

26, 2025, which means Whitetail's response was due on July 17, 2025. Because Whitetail did not file its response brief (Doc. 45) and other opposition materials (Docs. 46, 47) until July 18, 2025, Defendants argue the filings should be stricken as untimely. Although Whitetail's responsive filings were a day late, Defendants had the opportunity to file a reply brief and there is no indication or allegation that they were prejudiced as a result of the minimally late filings. Defendants' first motion to strike is denied.

Second, Defendants move to strike Whitetail's motion for partial summary judgment, supporting brief, and statement of undisputed facts, and Jones's supporting affidavit on the ground that they are untimely. (Doc. 51). On January 13, 2025, the Court entered an order extending the fully briefed motions deadline to July 31, 2025. (Doc. 34). Summary judgment response briefs are due 21 days after the motion is filed, and reply briefs are optional. L.R. 7.1(d)(1)(C) ("The moving party **may** file a reply within 14 days after the response was entered in the docket.") (emphasis added). Motions are "deemed ripe for ruling at the close of the time for response, unless otherwise indicated in the scheduling order." L.R. 7.1(d)(1)(D). Whitetail filed its motion for summary judgment on July 9, 2025 (Doc. 42), and the motion was fully briefed for purposes of the scheduling order with the filing of Defendants' response 21 days later, on July 30, 2025. (Doc. 57). Whitetail's motion was thus timely, and Defendants' motion to strike is meritless

and thus denied. Having dispensed with Defendants' procedural motions, the Court turns to the merits of the summary judgment motions.

## II.   <u>**Legal Standards**</u>

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48

(emphasis in original). If the non-moving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex*, 477 U.S. 317 (1986).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 249–50. The court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255.

When presented with cross-motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

## III.   Discussion

Before addressing the pending summary judgment motions on the merits, the Court provides a brief overview of the Miller Act, 40 U.S.C. §§ 3131 et seq.

### A.   The Miller Act

The Miller Act governs surety bonds on federal construction projects that cost more than $100,000. *Alameda Electric Distributors, Inc. v. Eco Engineering Inc.*, 2025 WL 3079873, at *1 n.1 (N.D. Cal. Nov. 4, 2025). The purpose of the

Miller Act is "to protect persons supplying materials and labor for federal projects, and it is to be construed liberally in their favor to effectuate this purpose." *United States for use of Morgan v. Harry Johnson Plumbing & Excavation, Inc.*, 2020 WL 12833584, at *4 (E. D. Wash. Apr. 3, 2020) (quoting *U.S. for Use and Benefit of Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.*, 750 F.2d 759, 761 (9th Cir. 1984)).

Before a construction contract of more than $100,000 is awarded, a contractor must post both a performance bond and a payment bond for the project, "which become binding when the contract is awarded." 40 U.S.C. § 3131(b). The statute authorizes any "person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made" to bring "a civil action on the payment bond or the amount unpaid at the time the civil action is brought[.]" 40 U.S.C. § 3133(b)(1). Any civil action under § 3133 must be filed "in the name of the United States for the use of the person bringing the action." 40 U.S.C. § 3133(b)(3)(A).

A "surety's liability on a Miller Act bond must be at least coextensive with the obligations imposed by the Act if the bond is to have its intended effect." *Apple*

12

*Valley Communications, Inc. v. Budget Electrical Contractors, Inc.*, 2021 WL 1502713, at \*6 (C.D. Cal. Apr. 7, 2021) (quoting *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 215-16 (1957)). "Therefore, 'the liability of a surety and its principal on a Miller Act payment bond is coextensive with the contractual liability of the principal only to the extent that it is consistent with the rights and obligations created under the Miller Act.'" *Apple Valley*, 2021 WL 1502713, at \*6 (quoting *U.S. for Use and Benefit of Walton Tech., Inc. v. Westar Engineering, Inc*, 290 F.3d 1199, 1206 (9th Cir. 2002)). In other words, "[w]here a subcontract's terms are consistent with the Miller Act's provisions, the surety's liability on the Miller Act bond is coextensive with the contractual liability of its princip[al]." *United States v. Sierra Range Construction*, 2024 WL 1377642, at \*8 (D. Nev. March 31, 2024) (citing *Sherman*, 353 U.S. at 215-16).

"The liability of a surety under the Miller Act is controlled by federal law, rather than state contract law[.]" *Apple Valley Communications, Inc. v. Budget Electrical Contractors, Inc.*, 2020 WL 8385651, at \*5 (C.D. Cal. Dec. 8, 2020) (citation and internal quotation marks omitted); *see also F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 127 (1974) ("The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law."). The court may, however, "look to state law when interpreting contractual provisions" in

13

a Miller Act case. *Apple Valley Communications¸* 2020 WL 8385651, at \*5 n. 5.

"[T]he measure of recovery under the Miller Act is generally determined by the terms of the subcontract." *Apple Valley Communications,* 2021 WL 1502713, at \*6 (citing *Taylor Construction, Inc. v. ABT Serv. Corp.* 163 F.3d 1119, 1222 (9th Cir. 1998) ("The Ninth Circuit has consistently ... used the underlying bonded subcontract as the measure of recovery in Miller Act cases. Sources from other authorities show there is no doubt that under the Miller Act recovery for work performed under the subcontract is the amount due under the subcontract.").

Because a surety's liability on a Miller Act bond is generally coextensive with the contractual liability of the principal, the Court will address the parties' contract claims before turning to Whitetail's Miller Act claim.

## B.   Contract Claims

### 1.   Breach of Contract

Under Montana law, "[t]he essential elements of a breach of contract claim claim are: (1) a valid and enforceable contract; (2) breach of an express or implied contract duty or obligation; and (3) resulting contract damages." *Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 859 (Mont. 2022).

Whitetail's breach of contract claim is set forth in Count 2 of the Complaint. (Doc. 1 at ¶¶ 17-19). Whitetail alleges that Northcon breached the subcontracts by: failing to timely pay in full for Whitetail's work; wrongfully terminating Whitetail

under the subcontracts; mismanaging the Project, including the change order and pay applications processes; improperly withholding amounts due under the subcontracts; improperly back-charging amounts to Whitetail, including purchasing materials and labor "on behalf" of Whitetail without notice or justification; and unjustifiably making payment in part by joint check to Whitetail and a subcontractor. (Doc. 1 at ¶ 18). Northcon, in turn, asserts a counterclaim alleging that Whitetail breached the subcontracts by failing to perform the required work, wrongfully walking off the jobsite, overbilling the Project, and performing defective work. (Doc. 13 at 10-11).

Northcon argues that Whitetail's breach of contract claim fails as a matter of law for several reasons and moves for partial summary judgment on liability as to its breach of contract counterclaim. Northcon first contends that regardless of any payment dispute, the subcontracts required Whitetail to continue its work on the Project, which it failed to do. (Doc. 39 at 5-6). Defendants rely on Section 7 of the subcontracts, which governs "Claims" and provides in relevant part:

> If any dispute shall arise between Contractor and Subcontractor regarding performance of the work, or any alleged change in the work, Subcontractor shall timely perform the disputed work and shall give written notice of a claim for additional compensation for the work within the time proscribed in the Prime Contract or within ten (10) calendar days (whichever is shorter) after commencement of the disputed work. …

(Doc. 36-1 at 4; Doc. 36-2 at 4). Defendants read this language too broadly. Section 7 applies specifically to disputes between a contractor and subcontractor

"regarding performance of the work, or any alleged change in the work" and says nothing about disputes regarding payment like those that have arisen here. Accordingly, to the extent Defendants assert that the Section 7 required Whitetail to continue its work on the Project notwithstanding its payment dispute with Northcon, the Court is not persuaded.

Defendants next argue the record establishes that Whitetail breached the subcontracts by failing to perform its scope of work on the Project and deliberately stopping its work, such that it was in default and Northcon was entitled to suspend any further payment. (Doc. 39 at 6-7). Whitetail counters that it was Northcon who breached the subcontracts by failing to timely pay Whitetail in full for its work on the Project. Whitetail takes the position that it rightfully suspended work on the Project because Northcon's prior breach excused it from any further performance. (Doc. 45 at 7).

The Montana Supreme Court "has held that where a party to a contract materially breaches a contract, the injured party is entitled to unilaterally suspend his performance." *King Resources, Inc. v. Oliver*, 59 P.3d 1172, 1178 (Mont. 2002) (citing *Liddle v. Petty*, 816 P.2d 1066, 1068 (Mont. 1991)); *see also James Talcott Construction, Inc. v. P&D. Land Enterprises*, 141 P.3d 1200, 1207 (Mont 2006) ("[A] party who breaches a contract cannot claim entitlement to the contract's benefits after such breach."). Whitetail argues, and the Court agrees, that there are

genuine issues of material fact precluding summary judgment in Northcon's favor on the breach of contract claims.

One such issue involves Whitetail's assertion that Northcon wrongfully failed to pay all amounts due on Whitetail's first payment application. Whitetail points to Northcon's email dated November 30, 2023, stating that it would pay Whitetail's application for payment only "half now with the other half released pending receipt of [Whitetail's] bond." (Doc. 44 at ¶ 7, citing Doc. 44 at 12). According to Whitetail, it offered to obtain an ILOC but Northon failed to meet Whitetail's conditions for doing so—specifically, that Northcon release the balance due on Whitetail's initial payment application and not hinder payment on Whitetail's second payment application. (Doc. 44 at ¶ 8, citing Doc. 44 at 17).

Under Montana law, "if reasonable grounds exist to believe that a party to a contract will breach by non-performance, the other party may demand adequate assurance of performance and suspend his own performance on the contract, if reasonable, until adequate assurance is received." *Blackfeet Tribe of Blackfeet Indian Reservation v. Blaze Construction, Inc.*, 108 F.Supp.2d 1122, 1140 (citing *Julian v. Montana State Univ.*, 747 P.2d 196, 199 (1987), citing Restatement (Second) of Contracts § 251 (1979)). The purpose of this rule "is to give a party recourse in the event the other party to a contract indicates he will not perform, but

his actions do not yet rise to a level of anticipatory repudiation." *Blackfeet Tribe*, 108 F.Supp.2d at 1140 (citing *Julian*, 747 P.2d at 199-200).

Northcon argues it had reasonable grounds to believe that Whitetail would not fulfill its obligations under the subcontracts and was therefore entitled to suspend payment until it received adequate assurance. Northcon cites concerns about Whitetail's performance—including billing and payroll practices—and Whitetail's creditworthiness based on a prior bankruptcy filing.[1] (Doc. 38 at ¶¶ 25-28, 33, 35-37, 39-46, 49-53). Whitetail disputes many of these factual assertions. (Doc. 47 at ¶¶ 25-28, 33, 35-37, 39-46, 49-53). On the record as presented and argued by the parties, the Court finds that whether Northcon had reasonable grounds to believe that Whitetail would not perform its obligations under the subcontracts such that it was entitled to withhold payment pending adequate assurance is a genuine issue of material fact. Additionally, it is not clear based on the summary judgment record what amounts were withheld by Northcon based on

---

[1] To the extent Defendants argue that Section 6 of the subcontracts gave Northcon the contractual right to direct Whitetail to obtain a bond or some other assurance of future performance, the Court is not persuaded. Section 6 governs "Changes in Work" and provides, in part: "Contractor shall have the right by written order to direct changes, additions, deletions, or alterations to the Subcontract Work or the time of performance. … No changes in the work covered by this Agreement shall exonerate any surety or any bond given in connection with this Agreement." (Doc. 36-1 at 4; Doc. 36-2 at 4). Section 6 addresses changes in work but says nothing about Northcon's right to require a bond or other assurance that Whitetail would perform the work required.

Whitetail's alleged failure to provide adequate assurance, and whether Northcon later released any withheld funds.

Other issues of fact center on whether Northcon wrongfully failed to pay Whitetail for work performed between December 2023 and February 2024. Whitetail's owner, Jasper Jones, states in a supporting affidavit that by Northcon's own calculations, the payment balance due to Whitetail as of March 4, 2024, was $809,797.00." (Doc. 44 at ¶ 15, citing Doc. 44 at 32). The spreadsheet Jones relies on shows that between October 2023 and February 2024, Whitetail billed Northcon a total of $1,268,103.00, and Northcon paid a total of $458,306—including joint check and amounts withheld for payment of vendors—leaving a balance due of $809,797.00. (Doc. 44 at 32). As Northcon points out, however, this spreadsheet was prepared by Northcon's Chief Financial Officer, Erik Panke. (Doc. 56 at ¶ 5). Panke states that the document reflects "the amount that Northcon understood that Whitetail was demanding based on the records available at that time," and "is not an acknowledgment that the amounts Whitetail asserted to be due, were in fact due." (Doc. 56 at ¶ 5).

According to Panke, Whiteail did not submit and complete and accurate payment applications every month, billed Northcon for progress not made, and billed excessively. (Doc. 56 at ¶ 3). But according to Jones, Whitetail's payment applications were certified and were accurate, Whitetail did not overbill, and as of

19

February 28, 2024 there were a number of unexecuted change orders for which it had not been paid. (Doc. 44 at ¶ 11, citing 44 at 24, Doc. 44 at ¶ 12). These competing affidavits raise a genuine issue of material fact that is relevant to whether Northcon paid Whitetail all amounts due under the subcontracts.

Northcon also argues it permissibly withheld certain payments pursuant to Section 2 of the subcontracts, which authorized Northcon to "withhold amounts otherwise due…to cover…contractor's reasonable estimate of any liability Contractor has incurred or may incur for which Subcontractor may be responsible…subject to adjustment when the exact amounts of liability are determined." (Doc. 39 at 8, citing Doc. 36-1 at 3 and 36-2 at 3). Again citing Panke's affidavit, Northcon explains that leading up to the time Whitetail stopped working on the Project, Northcon was prepared to release additional funds to Whitetail by way of joint checks to Whitetail and its material suppliers, but Whitetail did not provide the requisite invoices. (Doc. 58 at 22 ¶ 17, citing Doc. 56 at ¶ 11). Northcon also points to evidence that it made purchases on Whitetail's behalf through March 1, 2024. (Doc. 47 at ¶ 50, citing Doc. 36-7). But it is not clear based on the summary judgment briefing and materials of record whether, or exactly how, the amounts Northcon claims it spent on materials and was prepared to pay by joint check affect any payment due at the time Whiteail stopped work.

Northcon next argues that under the subcontracts' pay-if-paid provisions

Whitetail was not entitled to payment for work unless and until Northcon received payment from IHS, and because Northcon's original February 2024 payment application was denied, Whitetail was not entitled to further payment at the time it stopped work.[2] (Doc. 39 at 7-8). IHS initially rejected Northcon's February 2024 payment application because it apparently determined that it had overpaid Northcon for electrical and plumbing work based on the amounts billed compared to the progress made. (Doc. 36 at ¶ 18; Doc. 36-12). According to Northcon it resubmitted the February 2024 payment application to reflect a $320,000 credit to IHS for electrical and plumbing work, but by the time it did so Whitetail had stopped work on the Project. (Doc. 36 at ¶ 18; Doc. 56-1).

As Whitetail points out, however, Northcon did not advise Whitetail that the February 2024 payment application had been denied until after Whitetail gave notice that it was suspending work on the Project for nonpayment (Doc. 46 at ¶ 17), and after Northcon asked Whitetail to remove all its equipment and trailers

---

[2] The Ninth Circuit has held that a pay-if-paid provision in a contract does not relieve a contractor or surety from liability under the Miller Act. *See United States for the Use and Benefit of Walton Technology, Inc. v. Weststar Engineering, Inc.*, 290 F.3d 1199, 1209 (9th Cir. 2002). ("A subcontractor that has performed as agreed need not await the Government's payment of the contractor before initiating an action under the Miller Act against the contractor or the surety."). A pay-if-pay provision may, however, be used as a defense to a breach of contract claim. *See e.g. United States for the use and benefit of Mountain Utilities, Inc. v. Fidelity and Deposit Co. of Maryland*, 2022 WL 1538707, at *4 (D. Idaho May 16, 2022).

from the jobsite. But even assuming the paid-if-paid provisions are an available defense to Whitetail's claim that Northcon failed to pay it for work billed in the February 2024 payment application, whether Whitetail was entitled to further payment for prior work not covered by the February 2024 payment application is in dispute. Although Northcon asserts that it paid all funds to which Whitetail was entitled through December 2023 (Doc. 39 at 7, citing Doc. 38 at ¶¶ 49-54), Whitetail legitimately disputes this assertion. (Doc. 47 at ¶¶ 49-54). As addressed above, for example, whether Northcon wrongfully failed to pay all amounts due on Whitetail's first payment application is a genuine issue of material fact and is unrelated to the February 2024 payment application. Accordingly, to the extent Northcon contends Whitetail's breach of contract claim fails as a matter of law based on the subcontracts' paid-if-paid provisions, the Court is not convinced.

In sum, on the record as presented and argued by the parties, the Court finds there are genuine issues of material fact regarding (1) whether, as Northcon asserts, Whitetail breached the subcontracts by stopping its work on the Project, such that Northcon was entitled to suspend further payment, or (2) whether, as Whitetail asserts, Northcon breached the subcontracts by failing to pay Whitetail for work performed on the Project, such that Whitetail was entitled to suspend performance pending payment. Given the factual issues identified above, Northcon has not met its summary judgment burden of demonstrating that Whitetail's breach of contract

claim fails as a matter of law or that it is entitled to summary judgment on liability for its breach of contract counterclaim.

### 2. Implied Covenant of Good Faith and Fair Dealing

In Montana, "every contract, regardless of type, contains an implied covenant of good faith and fair dealing." *Story v. City of Bozeman*, 791 P.2d 767, 775 (Mont. 1990), overruled on other grounds by *Arrowhead School District No. 75 v. Klap*, 79 P.3d 250, 264 (Mont. 2003). "The covenant is a mutual promise implied in every contract that the parties will deal with each other in good faith and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance." *Knucklehead Land. Co., Inc. v. Accutitle, Inc.*, 172 P.3d 116, 121 (Mont. 2007) (citation and internal quotations omitted). "The conduct required by the implied covenant of good faith and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Mont. Code Ann. § 28-1-211 (2023). The nature and extent of the obligations of good faith and fair dealing are measured by the "justifiable expectations" of the parties, and a "breach of the covenant constitutes a breach of the contract." *Hardy v. Vision Service Plan*, 120 P.3d 402, 405 (Mont. 2005).

In Count 3 of the Complaint, Whitetail alleges that Northcon breached the implied covenant of good faith and fair dealing by: failing to remedy its

mismanagement of the pay application process; failing to cooperate with Whitetail regarding the pay application process; failing to act in good faith by requiring Whitetail to provide a bond or other assurance for the Project; failing to act in good faith in resolving disputes with Whitetail; wrongfully terminating Whitetail under the subcontracts; misrepresenting information in its Project-related communications with Whitetail; and improperly interfering with Whitetail's employment relationship with its employees. (Doc. 1 at ¶ 23). Northcon, in turn, asserts a counterclaim alleging that Whitetail breached the implied covenant of good faith and fair dealing by failing to perform work in good faith, wrongfully walking off the jobsite, and overbilling the project and performance of defective work. (Doc. 13 at 11 ¶ 27).

These competing claims for breach of the implied covenant are largely duplicative of the breach of contract claims discussed above, and the parties address all contract-based claims collectively in their summary judgment briefing. (Doc. 39 at 5-9, Doc. 45 at 7-11). The same genuine issues of fact that preclude summary judgment on breach of contract also preclude summary judgment on breach of the implied covenant of good faith and fair dealing.

To the extent Northcon does address the implied covenant directly in the briefing, its arguments highlight the factual nature of the dispute. Northcon accuses Whitetail of breaching "its duty of good faith and fair dealing by implementing a

scheme to cause Northcon to violate its prime contract obligations to IHS to maintain the project schedule." (Doc. 39 at 6). Northcon additionally asserts that by stopping work, Whitetail aimed to cause Northcon to miss a critical project milestone that depended on Whitetail first completing certain items of work, and that Whitetail's "objective in doing so was to create leverage over Northcon to recover more money." (Doc. 39 at 7). These are factual issues. Northcon's motion for summary judgment on breach of the implied covenant of good faith and fair dealing should be denied accordingly.

### 3.    Consequential Damages

Northcon asks the Court to rule as a matter of law that Whitetail is not entitled to consequential damages for breach of contract, including lost profits. Under Montana law, "[d]amages for lost profits may be awarded if such loss is shown to be 'the natural and direct result of the act of the defendant' and if the loss is not speculative." *Topco, Inc. v. State, Dept. of Highways*, 912 P.2d 805, 810 (Mont. 1996) (quoting *Olson v. Parchen*, 816 P.2d 423, 427 (Mont. 1991)). Lost profits must be "proven with a reasonable degree of certainty." *Riverview Homes II, Ltd. v. Canton*, 38 P.3d 848, 854 (Mont. 2001). While lost profits must "be proven with the best evidence under the circumstances which will support a reasonably close estimate of the loss," expert testimony is not required. *Lee v. Kane*, 893 P.2d 854, 856 (Mont. 1995) (internal quotation marks and brackets

omitted).

Whitetail first identified lost profits as consequential damages for breach of contract in its Rule 26(a) initial disclosures. (Doc. 37-5 at 4-5). Whitetail disclosed that it has incurred lost profit damages totaling $555,000 for the subcontracts at issue, and $1,379,000 for seven other projects. (Doc. 37-5 at 4-5). In opposition to Defendants' motion for summary judgment on consequential damages, Whitetail relies on the declaration provided by Jones, who similarly states that Whitetail has suffered lost profit damages totaling $555,000.00 for the subcontracts at issue and $1,379,700 for other projects Whitetail was performing or had committed to performing. (Doc. 46 at ¶¶ 26-29). According to Jones, Whitetail was unable to continue or begin performing on these other projects because of Northcon's failure to timely pay for Whitetail's work on the Project.

Although Whitetail has not provided contracts or other documentation to substantiate these alleged damages, the information provided in Jones's declaration is sufficient—albeit barely—for Whitetail's claim for lost profit contract damages to survive summary judgment.

### C.    Miller Act Claim

As set forth in Count 1 of the Complaint, Whitetail's Miller Act claim alleges that the obligations and conditions of the payment bond required Defendants to promptly pay Whitetail for its work on the Project. Whitetail claims

that Defendants breached their obligations under the payment bond because they failed to make timely payment in full for Whitetail's work, and as a result of Defendants' failure to do so Whitetail has been damaged in the principal sum of $895,551.98. (Doc. 1 at ¶¶ 13-16).

To prevail on a claim under the Miller Act, a plaintiff must establish that (1) the labor or materials were supplied in prosecution of the work provided for in the contract; (2) the supplier of the labor or materials has not been paid; (3) the supplier had a good faith belief that the materials were intended for the specified work; and (4) the jurisdictional requisites were met. *United States for Use & Benefit of Hawaiian Rock Prod. Corp. v. A.E. Lopez Enters., Ltd.,* 74 F.3d 972, 975 (9th Cir. 1996); *United States es rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.*, 750 F.2d 759, 761 (9th Cir. 1984). The jurisdictional requirement refers to meeting the statute's time limitations on notice and filing. *Hawaiian Rock Prods.,* 74 F.3d at 975. The filing provision requires a plaintiff to file suit within one year of "the day on which the last of the labor was performed or the material was supplied[.]" 40 U.S.C. § 3133(b)(4).

Whitetail argues the evidence of record establishes that the above elements are satisfied and asks the Court to rule as a matter of law that Defendants are liable on its Miller Act claim. (Doc. 43 at 6). The first and third elements are not genuinely in dispute, as the record is clear that Whitetail supplied labor and

27

materials for the Project and Defendants do not appear to contest that Whitetail had a good faith belief that the labor and materials were intended for the Project. (*See e.g.* Doc. 58 at ¶ 2). The record reflects that the fourth element is also satisfied. In compliance with the Miller Act's time limitation on filing, Whitetail filed suit June 3, 2024—approximately three months after it provided its Notice of Work Stoppage.

The parties' summary judgment arguments center on the second element of a Miller Act claim—whether Whitetail has been paid all amounts due for the labor and materials provided on the Project. With the possible exception of the paid-if-paid provisions, it appears that the terms of the subcontracts are consistent with the Miller Act and the parties do not argue otherwise. As determined above, whether Whitetail has been paid all amounts due for its work is in dispute. Because there are genuine issues of material fact on the second element of Whitetail's Miller Act claim, neither party is entitled to summary judgment on Count 1.

### D.    Remaining Claims

#### 1.    Failure to Timely Pay

Count 4 of the Complaint alleges a claim against Northcon for failure to timely pay pursuant to Title 28, Chapter 2, Part 21 of the Montana Code Annotated, which governs payment of construction contractors and subcontractors. (Doc. 1 at ¶¶ 26-31). Northcon argues Part 21 does not apply here because IHS, as

a federal agency, is not an "owner" within the meaning of the statute. The Court agrees.

The statute defines a "subcontract" as "a contract between a contractor and a subcontractor…the purpose of which is the performance of all or part of the construction contract." Mont. Code Ann. § 28-2-2101(8). A "construction contract" is defined as "a written agreement between and owner and a contractor to construct or improve…an improvement to real property," and a "contractor" is defined as "a person who has signed a construction contract with an owner." Mont. Code Ann. § 28-2-2101(1), (2).  An "owner" means "a governmental entity or private entity that has a legal interest in the real property improved or to be improved by the performance of the construction contract." Mont. Code Ann. § 28-2-2101(6). A "governmental entity," in turn, is defined as "a city, town, county, consolidated municipal-county government, school district, or other special district." Mont. Code. Ann. § 28-2-2101(3).

Because IHS is a federal agency, it is not a "governmental entity," and consequently, Northcon is not a "contractor" and the prime contract is not a "construction contract" within the meaning of Title 28, Chapter 2, Part 21. Whitetail does not address the statutory language, but argues the statutes applies because it is undisputed that "IHS is the owner/government agency of the project." (Doc. 45 at 11, citing Doc. 47 at ¶ 10). But a stipulation by the parties does not

29

override the plain language of the statute, which makes clear that "owner" does not include the federal government or its agencies. The Court therefore concludes that Title 28, Chapter 2, Part 21 of the Montana Code Annotated does not apply to the Project and subcontracts, and Whitetail's statutory claim for timely payment fails as a matter of law. *See Zumar Industries, Inc. v. Cyamus Corp.*, 418 P.3d 936, 939-41 (Ct. App. Ariz. 2017) (concluding that "owner" under comparable Arizona statute did not include the federal government or its agencies, and the statute therefore did not apply to a contract for a federal project). Northcon is entitled to summary judgment on Count 4 of the Complaint.

### 2.      Negligent Misrepresentation

Count 5 of the Complaint alleges a claim against Northcon for negligent misrepresentation. (Doc. 1 at ¶¶ 32-42). To prevail on a claim for negligent misrepresentation under Montana law, a plaintiff must establish six elements:

> (1) the defendant made a representation as to a past or existing material fact; (2) the representation was untrue; (3) regardless of actual belief, the defendant made the representation without any reasonable ground for believing it to be true; (4) the representation was made with the intent to induce the plaintiff to rely on it; (5) the plaintiff was unaware of the falsity of the representation and justified in relying upon the representation; (6) the plaintiff, as a result of reliance, sustained damage.

*Lundeen v. Lake County*, 571 P.3d 995, 999-1000 (Mont. 2024) (citation omitted). Whitetail's negligent misrepresentation claim is premised on Northcon's February 22, 2024, email to Whitetail stating that IHS would be "releasing funding to us

30

tomorrow" and Northcon would "start cutting checks" to Whitetail on Monday, February 26, 2024. (Doc. 1 at ¶ 33; Doc. 44 at 19). Northcon argues this statement is not actionable because "[i]t did not result in any reliance or damages, particularly considering Whitetail had an ongoing obligation to perform its scope of work and the short time period between the purported dates—a matter of days." (Doc. 39 at 16). Whitetail counters, and the Court agrees, that there are genuine issues of material fact regarding the elements of its claim, including whether Northcon reasonably believed its statement was true, whether it intended Northcon to rely on it, whether Whitetail justifiably relied on the statement, and whether Whitetail suffered any damages as a result of its reliance. Northcon's motion for summary judgment on Count 5 should be denied.

### 3.    Tortious Interference

Count 6 of the Complaint alleges a claim against Northcon for tortious interference. (Doc. 1 at ¶¶ 41-46). To establish a prima facie claim of tortious interference under Montana law, "the plaintiff must show that the defendant's acts were (1) intentional and willful, (2) calculated to cause damage to the plaintiff in his business, (3) done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor, and (4) that actual damages and loss resulted." *Hughes v. Lynch*, 164 P.3d 913, 920 (Mont. 2007).

Whitetail's tortious interference claim alleges that during Whitetail's work

on the Project, Northcon intentionally and willfully enticed or induced Whitetail employees to leave Whitetail's employment, that Northcon's actions were without right or justifiable cause, and that Whitetail suffered damages and loss in its business as a proximate result of Northcon's actions. (Doc. 1 at ¶¶ 42-45).

Northcon argues Whitetail's claim fails as a matter of law due to lack of proof on each essential element. As clarified during discovery, Whitetail's tortious interference claim is premised on the theory that before Whitetail stopped work on the Project, Northcon arranged to hire some of Whitetail's employees to complete Whitetail's scope of work for compensation by Northcon. (Doc. 47 at ¶ 65; Doc. 46 at ¶ 25). According to Jones, "[e]ssentially, Northcon stole Whitetail's employees." (Doc. 46 at ¶ 25).

Northcon argues this claim fails as a matter of law because Whitetail does not cite to legal authority supporting its theory of liability and makes no showing as to the intentional and willful element, that any arrangement was somehow calculated to cause Whitetail damages, and that any arrangement was done with an unlawful purpose. (Doc. 61 at 4). While Jones's declaration testimony is somewhat sparse, the Court finds that his sworn statements are sufficient to survive summary judgment. Northcon's motion for summary judgment on Count 6 should be denied.

## IV.   Conclusion

For the reasons set forth above,

IT IS ORDERED that Defendants' Motion to Strike Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 48) and Motion to Strike Plaintiff's Motion for Partial Summary Judgment (Doc. 51) are DENIED.

IT IS RECOMMENDED that:

(1) Defendants' Motion for Summary Judgment (Doc. 35) be GRANTED as to Count 4 of the Complaint but be DENIED in all other respects.

(2) Plaintiff's Motion for Partial Summary Judgment (Doc. 42) be DENIED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 2nd day of February, 2026.

_____
Kathleen L. DeSoto
United States Magistrate Judge